# PLAINTIFF'S EXHIBIT B

## Plaintiff's Exhibit B

*Previous Prepared Statement of Shawn Marando for Federal Officials.*

I became employed with the City of Boston, Boston Police Department on 10 June 1998.

My initial assignment with the Boston Police Department was in the District of Mattapan / Dorchester which is also known as B-3. I was assigned there for approximately 6 years before requesting to be transferred to District E-18 / Hyde Park where I was raised and my family still resides.

During my tenure at District B-3, I had accumulated great street experience as a police officer in a very violent and busy neighborhood. When my transfer request was approved and I transferred to District E-18 in 2005, I took along with me my work ethic which focused on violent crimes and the removal of guns from the streets of Boston.

The then current Commander, Captain Michael Broderick was a prior United States Marine and appreciated the great work ethic of those that worked under his command and assisted in providing a safer environment to the residents of that community. In turn, arrests involving the recovery of firearms and the removal of violent persons from the community were usually rewarded with what is known as "C" days (Captain / Commander days) for good work and placing your life at risk while doing so. A "C" day could then be used for a day off at the officer's request and approval by the commander.

This is still a motivational factor around the city of Boston in most districts which continues to motivate young officers in the removal of firearms from the streets and being proactive rather than reactive in their patrolling assignments.

Although my Commander was Captain Broderick, my night shift overall supervisor was Lieutenant Frederick Conley. As the senior supervisor, that person would usually take command of the shift from indoors as the Duty Supervisor. In short, the duty supervisor would also be responsible for the safety of all prisoners brought into the station under arrest. A complete description of the duty supervisor's responsibilities can be viewed via under Rule # 106, of the Boston Police Departments Rules and Procedures.

I was not directly aware that I was offending my direct night shift supervisor by making arrests of violent offenders until Captain Broderick was replaced by Captain Armstrong in 2007.

Prior to that change in command, I had received nothing but positive feedback and awards in my files to include:

| Award | Date |
|---|---|
| Academy Fitness, Top Fitness Score Award | January 1998 |
| Commissioner's Commendation | February 2002 |
| Commissioner's Commendation | August 2002 |
| Winner, Commissioner's Ideas for Change | July 2005 |
| Trooper George L. Hanna Memorial Award for Bravery | October 2005 |
| Boston Police Department Medal of Honor | December 2005 |
| Boston Police Relief Association Memorial Award | December 2005 |
| Boston Police Patrolman's Association Honor Award | July 2006 |

On 25 July 2004 I suffered an injury during a 911 call for a response to 4 persons having been shot. During that response, while attempting to render medical triage support to those injured, my left leg suffered 7 breaks in the fibula, a fractured tibia and a Weber "C" fracture in the ankle. In short, my left leg was hanging off of my body while attacked by a suspect.

3

With foot dangling suspended from left shin area, I managed to restrain that suspect until other officers arrived to assist me, but I was medically incapacitated for approximately 6 months before I recovered and returned to full duty.

Upon my return to full duty, I worked very hard on my fitness and health in order to return to my prior working standards. In doing so, the gym was part of my daily routine where I worked hard and even with left leg having been broken in so many places was at my own personal best regarding strength standards naturally without the assistance of athletic performance stimulants or medications. Those stimulants or medications were then known as 'steroids' and today known as "TRT" (Testosterone Replacement Therapy), which is quite common and used by many police officers via prescriptions.

Upon the change of District E-18 commanders in 2007, I began to be treated differently by Lieutenant Conley. The Lieutenant would belittle me at roll call using sarcasm and derogatory comments such as "I know we all can't be a Shawn Marando, but Superintendent Dunford wants the rest of you to step up your stats."

As I am of prior military service and Lieutenant Conley was also having served in the United States Army, what he attempted to do by making such a statement was considered the solicitation of a 'Blanket Party'. This created a hostile work environment and was intimidating due to the expectation of his intentions. Please refer to this link for a further definition of that term.

https://www.bing.com/search?q=military+%27blanket+party%27&form=ANNTH1&refig=6921a2d25cfa424c8eec21156a2d74ab&pc=ASTS

Other such forms of harassment that unreasonably interfered with my work that I found undeserving, offensive, and humiliating were his laughing at roll calls in front of an average of 8-12 officers while directing me to change out of my regularly assigned duty clothing of civilian attire into uniforms to guard the mayors house for the first four hours of the shift.

It was not until later did I understand why he was doing this. By 'sitting' in the patrol car in front of then Mayor Menino's house, it prevented me from making arrests and allowed him to have less responsibilities. Most importantly, it allowed him to depart early before shift end to tend to more 'personal' matters.

This behavior from him continued and although his harassment was against the law as well as department rules and procedures, I did not complain as I was afraid of retaliation and possibly being transferred out of my district. Please refer to Boston Police Rule 114: Harassment Policy.

During the Spring of 2007, upon the new assignment of Captain Armstrong, I was working a detail on Hyde Park Ave near Poplar Street and received a cell call from an officer informing that 'the brass were on foot and headed my way and make sure I am in uniform.' I was always in uniform, but appreciated the head's up call just the same.

Arriving minutes later on foot, were Captain Armstrong and two other employees, one to include most importantly then Lieutenant Jack (John) McDonough and Deputy Superintendent Darrin Greeley

On arrival, Captain Armstrong greeted me and informed me that he had heard great things regarding my performance in the 'K-Car'. He further asked how I like being assigned to the K-car (?). I responded with, "I couldn't tell you Sir as I have not been in the K-car for some time now." Captain Armstrong then asked 'Why not?' and I looked at the rank on each person's shoulder as if I cannot speak freely without repercussions at which time Lieutenant McDonough stated, "Shawn, speak freely." I then informed the Captain that Lieutenant Conley had taken me out of the K-car and assigned me at the Mayor's house for a few weeks now.

It was quite obvious that Captain Armstrong was not happy with this statement as his facial expressions were evident of his displeasure being red and frowning. Of course my assumption would be based on my experience as a police officer and

5

responding to hostile situations and persons who might become violent and pose a threat to myself or others around me.

As soon as that same night Lieutenant Conley increased his harassing behavior towards me. Continuing more frequent statements at roll call and laughing out loud when telling me I would be assigned to the Mayors house and officers that would regularly be assigned to the wagon, would be required to change over into civilian attire and work in the K-car out of their regularly assigned unit of which they had been assigned for years together as partners, creating a further hostile workplace amongst them and myself.

During the month of June 2007, I took a total of 21 days off that month to directly avoid the lieutenant and his continued behavior. (with records to support this statement).

During the month of July 2007, I knocked on the office door of Lieutenant Conley and requested to "have a sit down" with him. He responded with, " I'm kind of busy right now.", as he smirked and pointed to his completely empty desk. I then asked if he freed up could he call me in, and he said he would.

Approximately three days passed without any effort made by the lieutenant to speak with me, but the harassing behavior continued. I then submitted a formal complaint dated 07/04/2007 into the hands of Captain Armstrong, apologized for doing so and exited his office. While off duty on days off, I received a call from a fellow officer informing me that I had been transferred back to District B-3.

That complaint dated 07/04/2007 is unaccounted for to date by the BPD with several attempts to locate it. I have also advised BPD legal advisor Joseph McClellan where I believed he could locate it. Strangely enough, no record of that harassment complaint could be found.

6

Within 36 hours of placing that complaint into the hands of my commanding officer, I was called by a fellow police officer and informed that I had been transferred back to District B-3, Mattapan, where I was later to be shot.

This transfer came entirely as a surprise to me and I was not spoken with prior to the reassignment or most importantly, the formal complaint that I had just filed.

Almost immediately, I began to receive phone calls from friends and witnesses listed in that complaint. This is quite contrary to the standard and procedure described in Boston Police Rule 114: Harassment Policy.

Upon my arrival to District B-3, I was sat down by the then Commander Captain James Claiborne and asked specifically about the complaint I filed and if it was going to present a problem for him there at District B-3.

This had blatantly demonstrated disregard for the department's policy on 'handling these matters with the utmost sensitivity and maintain confidentiality to the greatest extent possible.'

I told him it would not as I simply desired to be left alone to continue to perform my duties and career with the Boston Police Department.

In a time frame of possibly 1-2 weeks after being reassigned to District B-3, (07/06/07 – 07/14/07), Lieutenant Frederick Conley was somehow allowed to work overtime at my reassigned district of B-3. He not only worked overtime there, but he also worked my specific shift. This is also documented in my complaint dated 23 February 2010 attached.

7